UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 3:20-CR-48 JD

EARL D MILLER

**OPINION AND ORDER**

Defendant Earl Miller has renewed his motion for judgment of acquittal in this case after a jury found him guilty on five counts of wire fraud and one count of securities fraud. (DE 102.) Mr. Miller originally moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) after the Government finished presenting its case at a trial held in May, arguing that the Government had failed to present sufficient evidence of his intent to defraud with respect to the eight counts for which he was charged. The Court denied that motion (DE 94) and the jury went on to return a partial guilty verdict against Mr. Miller (DE 99). Mr. Miller's new motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c) renews his contention that the evidence cannot support finding an intent to defraud, this time, however, with respect only to the counts for which he was convicted. (DE 102.) For the foregoing reasons, the Court denies Mr. Miller's motion.

A.     **Factual Background**

Earl Miller was charged with eight criminal counts in relation to his role in owning and leading a group of investment businesses the Court will refer to for simplicity as the 5 Star businesses. While there were more than ten 5 Star businesses that existed during the time period at issue in this case, the primary businesses for purposes of this case were 5 Star Commercial,

LLC and 5 Star Capital Fund. Mr. Miller was alleged to have used the businesses to lure unsophisticated investors, particularly members of the Indiana Amish community, into real estate and green investments that promised to pay generous interest over 30-month terms. In addition to promises from Mr. Miller or other 5 Star employees about the benefits of the various investments the 5 Star businesses were offering, investors also received investment-related paperwork, including private placement memoranda and promissory notes laying out the terms of the investments.

While the 5 Star businesses appear to have operated well for a while, the businesses began to unravel in the time between 2014 and the summer of 2015. The unraveling corresponded with the time during which Mr. Miller took over sole control of the businesses and collected investments from individuals, including the named victims in this case Merle Yoder, Ned Welder, Wade Wenger, and James Eigsti, despite the businesses' struggles. The 5 Star businesses eventually filed for bankruptcy in early 2016 without making many of the interest payments investors had been promised.

Six of the criminal counts the Government brought against Mr. Miller charged him with committing acts of wire fraud, one of the counts charged him with securities fraud, and one of the counts charged him with bankruptcy fraud. After a trial, a jury convicted Mr. Miller on the securities fraud count and five of the wire fraud counts. The five convictions for wire fraud were tied to investments that Mr. Yoder, Mr. Welder, Mr. Wenger, and Mr. Eigsti had made with the 5 Star businesses. The securities fraud conviction was based more broadly on the fraudulent scheme to take and use investors' money for unapproved purposes the Government had alleged Mr. Miller perpetrated while running the 5 Star businesses. Mr. Miller is now challenging the

verdict by arguing that the evidence presented at trial was not enough to find he had the intent to defraud required for his convictions.

**B.      Standard of Review**

Under Rule 29(c), it is the defendant's burden to show that the trial evidence was insufficient to support a conviction, and that burden "is indeed a high one." *United States v. Hopper*, 934 F.3d 740, 754 (7th Cir. 2019). The defendant cannot prevail on his sufficiency of the evidence claim unless he demonstrates that no rational jury could have found that the circumstances of his crimes indicated an intent to defraud. *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). In making this determination, a court views all evidence and draws all reasonable inference in the light most favorable to the prosecution. *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010).

**C.      Discussion**

Mr. Miller's sole argument in his renewed motion for judgment of acquittal is that there was insufficient evidence to support that he intended to defraud anyone. (DE 102 ¶ 2.) The Court thus confines its analysis in this order to whether a rational jury could find an intent to defraud based on the evidence. It will not consider whether the evidence could support any of the other elements required to prove the claims for which the jury convicted Mr. Miller because those elements are not being challenged. *See United States v. Wilson*, 879 F.3d 795 (7th Cir. 2018) (affirming district court's denial of Rule 29 motion when district court's ruling only addressed those issues the defendant specifically raised); *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012) ("We have held that when a defendant challenges the sufficiency of the evidence by

3

motion for judgment of acquittal and makes specific arguments in support of that motion, any arguments omitted are thereby forfeited.").

An "intent to defraud" means that the defendant acted willfully and with specific intent to deceive or cheat, usually for the purpose of receiving a financial gain himself or causing financial loss to another. *United States v. Pust*, 798 F.3d 597, 600–01 (7th Cir. 2015). Because direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension. *See United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994).

As the Government noted in its response to Mr. Miller's recent motion, much of Mr. Miller's motion repeats the arguments he made when he first moved for a judgment of acquittal before trial had ended. (DE 106 at 2.) The largest difference at this stage is that the Court can now consider Mr. Miller's own testimony as well as the evidence he submitted during trial after the Government rested. But while the Court is cognizant of Mr. Miller's testimony and the evidence he presented, it is still bound to interpret all evidence in the light most favorable to the prosecution and finds that the new evidence does not change the fact that there was sufficient evidence for a rational jury to find Mr. Miller had the requisite intent to defraud for each of the counts of conviction. *See Johnson*, 592 F.3d at 754; *Paneras*, 222 F.3d at 410. The Court considers the evidence supporting each count for which Mr. Miller was convicted in turn, starting with the five counts of wire fraud.

1. ***Count 1 – wire fraud tied to Merle Yoder's investments***

Count 1 charged Mr. Miller with wire fraud in relation to Merle Yoder's $40,000 investment with 5 Star Capital. As the Court noted in its prior order, the Government presented evidence that Mr. Miller signed a promissory note related to Mr. Yoder's investment that promised a 12% annual return on the investment with monthly payments for 30 months. (DE 94 at 2); (Govt. Ex. 19). Evidence presented at trial suggested that Mr. Miller was aware that his 5 Star Capital business was in financial trouble when Mr. Yoder made his investment and received the promissory note on June 19, 2015. Specifically, Mr. Miller testified that he had chosen to hire Global Impact Strategies, a company known for helping with business turnarounds, to help the struggling 5 Star businesses during the same mid-June 2015 time that 5 Star Capital accepted Mr. Yoder's investment. (Miller Transcript, DE 105 at 35:20–36:9.) Mr. Miller further testified that he and 5 Star had made the decision to stop raising investor funds around that time because of concerns about being unable to sustain the business and pay back investors. (*Id.* at 40:10–25.) But Mr. Miller took Mr. Yoder's investment into the business anyway and, as confirmed by Mr. Yoder, only ever paid Mr. Yoder one of the promised monthly payments. (Yoder Transcript, DE 111 at 10:20–23.) Taken together, that evidence could suggest to a jury that Mr. Miller willfully deceived Mr. Yoder to get Mr. Yoder's investment money while Mr. Miller knew that 5 Star Capital was struggling, that 5 Star Capital should not have been taking new investments, and that Mr. Yoder would not receive the returns he was promised.

Further evidence presented at trial adds more support to a finding of an intent to defraud. Mr. Yoder testified that he made his investment with the understanding that his money would be put into real estate. (Yoder Transcript, DE 111 at 7:24–8:6, 13:11–25.) But evidence from the Government suggested that Mr. Yoder's money was actually placed into a 5 Star account used to pay other investors and was ultimately paid to a company that was involved not in real estate but

5

in trying to bring green products to market. (Govt. Ex. 28.) The use of Mr. Yoder's funds for a different purpose than Mr. Yoder was led to believe could suggest to a jury that Mr. Miller in particular intentionally deceived Mr. Yoder because Mr. Miller admitted that he was the person within 5 Star who was responsible for overseeing and transferring money associated with the 5 Star accounts. (Miller Transcript, DE 105 at 117, 119–24) (testifying that he was the individual who made all decisions over the 5 Star companies, including managing all the investments, setting the percentage return on investments, and being the sole authorized signor for all of the 5 Star bank accounts). The Court finds that a jury could thus conclude, based on this combined evidence, that Mr. Miller intentionally used Mr. Yoder's investment money for a different purpose than Mr. Yoder had been led to believe and did so to either benefit himself, the 5 Star companies, or his contacts with the individuals trying to bring green products to market. Thus, while Mr. Miller has insisted that he never intended to defraud anyone (DE 102 ¶ 7), the Court finds there is sufficient circumstantial evidence for a rational jury to find that Mr. Miller had the requisite intent to defraud to be convicted for wire fraud tied to Mr. Yoder's investment.

 2. *Counts 2 and 3 – wire fraud tied to Ned Welder's investments*

Mr. Miller's convictions on Counts 2 and 3 were connected to wire fraud involving investments Ned Welder made on behalf of himself and his parents' estate. The Court finds, as it did in its prior order (DE 94 at 3), that there is sufficient evidence to support a guilty verdict on each of these two counts, because Mr. Miller had the requisite intent to defraud. First, the Government presented evidence that the Welders received promissory notes signed by Mr. Miller on June 26, 2015, after Mr. Welder invested $100,000 for himself and $100,000 for his parents' estate into 5 Star Capital. (Govt. Ex. 12; Govt. Ex. 14.) Like the promissory note Mr. Yoder received, the two promissory notes associated with the Welder investments promised 12%

6

annual returns over 30 months. (Govt. Ex. 12; Govt. Ex. 14.) Also like the promissory note Mr. Yoder received, the assurances of payment in the Welders' promissory notes came at a time when Mr. Miller admitted he had to hire Global Impact because his 5 Star businesses were in serious trouble and at the same time Mr. Miller testified that he and his companies had decided to stop taking any new investments. (Miller Transcript, DE 105 at 35:20–36:9, 40:10–25.) That evidence could suggest to a jury that Mr. Miller willfully took the $200,000 from the Welders for his business knowing that there was no likelihood that the Welders would get the return on their investments that they had been promised. Testimony from Mr. Welder confirmed that, after only a few months at most, he and his parents received notifications from Mr. Miller and the 5 Star businesses that they would no longer be receiving the promised payments. (Welder Transcript, DE 109 at 15:1–24.) The Court finds that this evidence linked to the signed promissory notes could suggest to a rational jury that the promissory notes contained illusory promises of return for the Welders' invested money and suggests that Mr. Miller had the required intent to defraud to be convicted of the wire fraud charged in Counts 2 and 3.

Second, the Government introduced evidence that Mr. Welder received a private placement memorandum ("PPM") for his investments that a rational jury could conclude misrepresented the nature of the investments. Mr. Welder testified during trial that he recognized a 5 Star Capital Fund document introduced at trial as the PPM that he received in conjunction with his investments. (Welder Transcript, DE 109 at 7:13–22.) The PPM, which Mr. Miller signed, included assurances that, among other things, 5 Star Capital held patents to green products into which the Welders' invested money would go and that 5 Star Capital had agreements in place to distribute the green products through large chain stores. (Govt. Ex. 2 at 7.) But evidence presented at trial, including testimony from Scott Bocklund, an individual Mr.

Miller brought in to review the 5 Star businesses' finances, indicated that 5 Star Capital did not own any of the patents that the PPM claimed it did and that there were no plans or agreements to distribute the products through large chain stores. Mr. Miller confirmed that Mr. Bocklund had testified about the lack of patents, but Mr. Miller blamed the misrepresentation on a lie the green product developers had told him and insisted he had not intentionally deceived anyone in the PPM. (Miller Transcript, DE 105 at 145–47.) While the Court notes Mr. Miller's insistence that he did not intentionally deceive anyone about the green patents, it must construe the evidence and make all reasonable inferences in the light most favorable to the prosecution. Given that standard, the Court concludes that a rational jury could construe the evidence as suggesting that the statement in the Miller-authored PPM was a deliberate misstatement meant to make investors more willing to place their money with 5 Star Capital and thus an indication of an intent to defraud.

The PPM Mr. Welder received, and Mr. Miller signed, also included other assurances that evidence at trial suggested were untruthful and which further could support an intent to defraud. For example, the PPM stated that the company would "do its best to manage risks," (Govt. Ex. 2 at 7), but Mr. Bocklund testified that his review of the company's records after Mr. Miller brought him in to help straighten out the businesses indicated there had been little if any due diligence done on the green investments before Mr. Miller sent money toward the green products. The PPM also indicated that investments would only be collected from accredited or sophisticated investors. (Govt. Ex. 2 at 6.) Evidence presented at trial suggested that that representation was false as applied to Mr. Welder given that Mr. Welder testified that he considered himself a non-sophisticated investor. (Welder Transcript, DE 109 at 4:23–5:6, 9:12–13.) While circumstantial, this evidence, taken together, could add further support to the

evidence of intentional misrepresentations discussed above and lead a rational jury to find that Mr. Miller, who was responsible for running 5 Star Capital and signed the PPMs, intentionally misrepresented the nature of the investments and business Mr. Welder and his parents were becoming involved with. It further suggests that Mr. Miller did so with an intent to defraud Mr. Welder and Mr. Welder's parents out of their money so that 5 Star Capital could use the funds for its own ends in a way that supports a finding of the required intent to defraud for Counts 2 and 3.

### 3. *Count 4 – wire fraud involving Wade Wenger's investment*

Mr. Miller's conviction on Count 4 was connected to wire fraud tied to Wade Wenger's $100,000 investment with 5 Star Commercial. The Court again finds, as it did in its prior order (DE 94 at 3–4), that there is sufficient evidence for a rational jury to find Mr. Miller guilty on Count 4 because Mr. Miller had the requisite intent to defraud. First, evidence presented at trial shows that Mr. Wenger, who invested with 5 Star Commercial in early July 2015, was allowed to invest at a time when Mr. Miller knew the 5 Star businesses were struggling, had brought in Global Impact to help, and had supposedly decided to stop taking new investors. (Govt. Ex. 9 and 10); (Miller Transcript, DE 105 at 35:20–36:9, 40:10–25.) Despite that, the evidence shows Mr. Wenger received a promissory note signed by Mr. Miller that promised Mr. Wenger 10% annual returns on his investment with monthly payments for 30 months. (Govt. Ex. 10.) Mr. Wenger's own testimony confirmed that he only ever received one monthly payment after making his investment. (Wenger Transcript, DE 110 at 12:20–14:23.) The Court finds that this evidence, like the evidence discussed above related to Mr. Yoder's and Mr. Welder's investments, could lead a jury to find that Mr. Miller intentionally misrepresented the nature and security of Mr. Wenger's investment to convince Mr. Wenger to invest money into Mr. Miller's

5 Star Commercial company while knowing Mr. Wenger would not recoup his investment as promised.

Second, evidence shows that Mr. Miller created and signed a PPM, which Mr. Wenger received, that stated money invested into 5 Star Commercial would solely be put toward real estate opportunities. (Wenger Transcript, DE 110 at 9:1–13, 11:19–12:5); (Govt. Ex. 1 at 7.) Mr. Wenger also confirmed that he invested his money under the belief that his money would only be invested in real estate. (Wenger Transcript, DE 110 at 8:13–15.) But the evidence did not suggest that Mr. Wenger's money actually went to real estate. Instead, it suggested that the money, which Mr. Miller admitted to overseeing and controlling (Miller Transcript, DE 105 at 117, 119–24), actually went to pay Global Impact as part of trying to save the 5 Star businesses, (Govt. Ex. 25). While Mr. Miller argued in his reply brief that he "did not personally allocate this money to Global" (DE 107 at 6), the court, construing the evidence in the light most favorable to the prosecution, finds that the evidence, including his own testimony (Miller Transcript, DE 105 at 117, 119–24), could reasonably be interpreted as confirming that he was the one in charge of signing off on how the 5 Star businesses distributed their money at the time Mr. Wenger's money was transferred. Thus, viewing all of the evidence related to the Wenger investment that was presented at trial, the Court finds that a rational jury could conclude that Mr. Miller had the requisite intent to defraud to be found guilty on Count 4, as shown by the evidence's suggestion that he took Mr. Wenger's money into his business with no intention of using it for the stated purpose and with no intention of ever paying Mr. Wenger back as promised.

### 4.     *Count 6 – wire fraud involving James Eigsti's investment*

Mr. Miller's conviction on Count 6 was based on wire fraud tied to James Eigsti's $50,000 investment with 5 Star Investment Group I. The Court again finds, as it did in its prior

order (DE 94 at 4–5), that there is sufficient evidence for a rational jury to find Mr. Miller guilty on Count 6 because Mr. Miller had the requisite intent to defraud. Mr. Miller personally met with Mr. Eigsti in mid-July in the 5 Star offices when Mr. Eigsti came in to discuss the prospect of investing with 5 Star. (Eigsti Transcript, DE 108 at 8:7–20.) The meeting came several weeks after Mr. Miller had decided to bring in Global Impact and stop taking new investors because of the state of the 5 Star businesses. (Miller Transcript, DE 105 at 35:20–36:9, 40:10–25.) During their meeting, Mr. Miller told Mr. Eigsti that Mr. Eigsti's funds, should he choose to invest, would be invested in real estate projects, and Mr. Miller went so far as to show Mr. Eigsti a picture of the supposed property into which Mr. Eigsti's funds would be invested. (Eigsti Transcript, DE 108 at 8:7–20, 8:21-11:18.)

When Mr. Eigsti did choose to invest, he received a promissory note signed by Mr. Miller that stated he would receive 10% interest annually on his investment with monthly payments for 30 months. (Eigsti Transcript, DE 108 at 20–21); (Govt. Ex. 5.) Mr. Eigsti also received a PPM that, among other representations, confirmed that his investment would only be used for real estate purposes (Eigsti Transcript, DE 108 at 12:7–13:14); (Govt. Ex. 6.) The evidence suggests that, in reality, Mr. Eigsti never received any of the monthly payments that the promissory note described (Eigsti Transcript, DE 108 at 21:21–24) and that Mr. Miller directed Mr. Eigsti's money to Z Ministries, a non-profit religious organization, instead of putting it into real estate (Miller Transcript, DE 130:17–131:4); (Govt. Ex. 24). This evidence could suggest to a rational jury that Mr. Miller took Mr. Eigsti's money knowing the 5 Star businesses were failing, never intending to pay Mr. Eigsti the promised returns, and knowingly misrepresenting to Mr. Eigsti how the money would be used. The Court thus concludes the evidence is sufficient to lead a

rational jury to conclude Mr. Miller had the requisite intent to defraud required to have been found guilty of the wire fraud charged in Count 6.

### 5. *Count 7 – securities fraud*

Having explained why the evidence could support finding an intent to defraud in relation to each of the five counts of wire fraud, the Court moves to Mr. Miller's final count of conviction for securities fraud. The Court concludes that the evidence could support finding that Mr. Miller had the requisite intent to defraud for this securities fraud count as well. Much of the evidence stated above that supported an intent to defraud in connection with the wire fraud counts similarly applies to support Mr. Miller's intent to defraud for the securities fraud count. As the Court previously discussed, there is evidence that Mr. Miller authored PPMs and signed promissory notes that misrepresented how investor money would be used, what patents the investment companies held, what risk mitigation would take place in conjunction with the companies' investment activities, and what returns investors could expect on their investments. (Govt. Ex. 1; Govt. Ex. 2; Govt. Ex. 5; Govt. Ex. 6; Govt. Ex. 10; Govt. Ex. 12; Govt. Ex. 14; Govt. Ex. 19.) Further, the evidence presented, including Mr. Miller's own testimony, suggested that he was in control of the money held in the 5 Star company accounts and was thus responsible for the investors' money being transferred to different individuals, companies, and uses than the investors had been led to believe. (Miller Transcript, DE 105 at 117, 119–24); (Govt. Ex. 25; Govt. Ex. 26; Govt. Ex. 28). The Court finds that a rational jury could reasonably conclude, based on that evidence, that Mr. Miller was knowingly and willfully taking individuals' money into his various businesses based on false promises about how the money would be used and what returns the investors would see so that he could bolster his businesses and use the money as he otherwise saw fit. That conclusion is further bolstered by other evidence

presented at trial that suggested Mr. Miller used investor money to, among other things, buy out his former business partner Matthew Gingerich, pay Global Impact and the law firm Cozen and O'Connor for their services, purchase a pontoon boat, and reimburse himself for an Escalade he purchased. (Miller Transcript, DE 105 at 118:13–20); (Govt. Ex. 30; Govt. Ex. 31; Govt. Ex. 32; Govt. Ex. 34; Govt. Ex. 35; Govt. Ex. 36). All of this evidence could support a rational jury's finding of an intent to defraud in relation to the securities fraud count.

      The Court also notes that there was additional evidence of misrepresentations and omissions associated with the Miller-authored PPMs that investors received that supports a finding that Mr. Miller had the requisite intent to defraud to be guilty of securities fraud. For example, evidence showed that certain versions of the PPMs given to investors stated Mr. Miller would not be receiving any salary from the 5 Star companies (Govt. Ex. 1 at 8; Govt. Ex. 2 at 8), when in reality Mr. Miller was receiving a $7,000-per-month salary, (Miller Transcript, DE 105 at 51). Additionally, the PPMs touted Mr. Miller's sales experience but failed to inform investors of Mr. Miller's limited education or business management experience. (Govt. Ex. 1 at 6; Govt. Ex. 2 at 6.) The PPMs also stated that the 5 Star businesses would not be engaged in advertising or soliciting their investments and that the businesses would only take investments from accredited or sophisticated investors. (Govt. Ex. 1; Govt. Ex. 2; Govt. Ex. 6.) Evidence suggests that, in reality, the 5 Star businesses were engaged in significant advertising, (Miller Transcript, DE 105 at 114:11–24; Welder Transcript, DE 109 at 4:23–5:10; Wenger Transcript, DE 110 at 5:17–6:6), and were primarily targeting unsophisticated investors with ties to the Amish community, (Miller Transcript, DE 105 at 113:12–114:7, 116:22–117:3; Eigsti Transcript, DE 108 at 15:23–16:2; Welder Transcript, DE 109 at 8:8–9:20); (Govt. Ex. 45). While this evidence is circumstantial with regard to an intent to defraud, when it is taken together with all the other

13

evidence of misrepresentations and omissions related to the companies and investments, it suggests a willful intent on the part of Mr. Miller to misrepresent the nature of his business activities and the safety of any investments individuals might choose to place with his companies. *See United States v. Domnenko*, 763 F.3d 768, 773 (7th Cir. 2014) (misrepresentations sufficient to show fraudulent intent); *United States v. White*, 737 F.3d 1121, 1131–32 (7th Cir. 2013) (same).

Mr. Miller has argued that the Court should not construe all of the evidence that has been discussed as an indication of his intent to defraud because it is circumstantial and because other evidence that he presented during trial has the potential to undermine some of the Government's evidence. For example, Mr. Miller argued in his briefing that he presented evidence during trial that he had worked to change the PPMs to correct certain mistakes contained in them, including the fact that he would be receiving a salary. (DE 107 at 3); (Def. Ex. I; Def. Ex. J; Def. Ex. O.) While it is true that he presented evidence to that effect, the evidence, even if it were accepted as true, still does not explain away certain misrepresentations in the PPMs, including that all investments would only be used for real estate and patented green products when in reality they were used for a variety of other expenses or that no solicitation would occur in the offering of the securities when there is ample evidence of advertising having taken place.

Mr. Miller's briefing also repeated many of the defenses that he put forward during trial, including that the use of funds for unapproved purposes should not be pinned on him because Global Impact was in control when all of those monetary transfers occurred, that he himself was tricked by the individuals who were promoting the green products, that he simply made bad business decisions instead of intentionally deceiving, and that he relied on the advice of his attorney in making all of his important decisions. (DE 107 at 4–8.) Mr. Miller also cited to his

own testimony, during which he stated multiple times that he did not intend to deceive anyone and that he always acted in good faith and upon advice of counsel. (Miller Transcript, DE 105 16:1–3, 99:19–100:7; DE 107 at 10.) Mr. Miller was allowed to raise all of these arguments and present all of his evidence, including his own testimony, at trial. And the jury was allowed to weigh those arguments and Mr. Miller's evidence before ultimately coming to its guilty verdict. Now faced with Mr. Miller's pending motion, the Court cannot find the jury's verdict was baseless.

The Court is bound to draw all reasonable inferences for the prosecution and, given the evidence presented, concludes that a rational jury could have found the intent to defraud required for each of the counts of conviction. Mr. Miller's arguments do not suggest that the Government failed to present any evidence of an intent to defraud, just that the Government's interpretation of the evidence that was presented in the case is not the right interpretation. (DE 107.) Mr. Miller can continue to insist that he "had no intent to defraud" and that "the circumstantial evidence does not support intent to deceive" in this case (DE 107 at 9), but Mr. Miller's opinion of the balance of the evidence is not enough. Neither a rational jury nor this Court is required to conform to Mr. Miller's view of the case and evidence. The Court, in considering Mr. Miller's pending motion, solely looks to see if there is a reasonable basis in the record for the jury's verdict. *See United States v. Geneva*, 333 F.3d 750, 757 (7th Cir. 2003) ("Rule 29(c) does not authorize a judge to play thirteenth juror."); *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000) ("As long as there is a reasonable basis in the record for the jury's verdict, it must stand."). The Court does not determine the credibility of witnesses or resolve evidentiary conflicts, it simply looks to whether there is relevant evidence from which a jury could determine Mr. Miller had the intent to defraud required for convictions on the crimes for which he was charged. *See*

*United States v. Wilson*, 879 F.3d 795, 803 (7th Cir. 2018). Here, as explained above, there is a reasonable basis in the record for the jury's finding that Mr. Miller had the requisite intent to defraud to be found guilty on Counts 1 through 4, Count 6, and Count 7.

**D.      Conclusion**

For the foregoing reasons, the Court DENIES Mr. Miller's motion for judgment of acquittal (DE 102).

SO ORDERED.

ENTERED: August 15, 2022

                                             /s/ JON E. DEGUILIO
                                             Chief Judge
                                             United States District Court