UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 3:20-CR-48 JD

EARL D MILLER

**<u>OPINION AND ORDER</u>**

Mr. Miller was previously convicted at a jury trial of five counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff(a). Following Mr. Miller's conviction, the Probation Office prepared a Presentence Investigation Report ("PSR") to aid the Court in sentencing. Mr. Miller has filed several objections to the PSR. On April 4, 2023, the Court held a telephonic status conference on the objection related to the loss amount calculation. (DE 147.) At this conference, the Court ordered supplemental briefing on the issue of loss amount. The briefing has now been filed and the objections are ripe for adjudication. The Court also held an evidentiary hearing on June 22, 2023, regarding loss amount. Based upon the evidence presented at that hearing and already in the record, and the parties' legal arguments, the Court makes the following rulings.

**(A) Discussion**

**(1) Offense Conduct (Paragraphs 6 – 23)**

Mr. Miller objects to the paragraphs in the PSR describing his offense conduct. Mr. Miller's entire objection is "The defendant does not agree with the offense conduct set out by the government and therefore objects to PSR ¶ 6 through 22 [*sic*] and requires the government to

prove it's [*sic*] allegations." (DE 121 at 1.) The Court regards the objection as merely a continuing claim of innocence.

The objection will be overruled for two reasons. First, Mr. Miller has failed to meaningfully challenge the substance of the paragraphs by presenting a bare denial which the Court may reject out of hand. It is the "defendant's task to show the trial court that the facts contained in the PSR are inaccurate" and "produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Moreno-Padilla*, 602 F.3d 802, 809 (7th Cir. 2010) (internal quotations omitted). Given that this is the Defendant's burden, a court may rely "entirely" on the presentence investigation report where the only objection is a "bare denial." *United States v. Hawkins*, 480 F.3d 476, 477 (7th Cir. 2007).

Second, the conduct described in paragraphs 6 through 23 is consistent with the evidence introduced at trial.[1] The jury ultimately convicted Mr. Miller based upon the conduct described in the PSR. Moreover, in the order addressing Mr. Millers' Rule 29 motion, the Court specifically identified evidence introduced at trial which supports the offense conduct described in paragraphs 6 through 23. (DE 112). In the absence of more specific objections from Mr. Miller, the Court overrules the objection and adopts paragraphs 6 through 23.

### (2) Loss Amount (Paragraph 27)

Mr. Miller objects to the proposed loss amount contained in the PSR; for the following reasons that objection will be sustained in part.

---

[1] These paragraphs only describe offense conduct for the charges which Mr. Miller was convicted of.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides that if the loss from an offense involving fraud or deceit exceeds $6,500, then there will be an increase to the offense level calculation based on the amount of loss. U.S.S.G. § 2B1.1(b)(1). The appropriate increase is reflected in a corresponding table. *Id.* The parties do not contest that Mr. Miller's offense caused a loss of more than $6,500, but vociferously disagree on what the loss amount is.

The Government bears the burden, under the preponderance of the evidence standard, to establish a loss amount. *United States v. Hogge*, No. 2:07-cr-46, 2011 WL 1158442, at *4 (N.D. Ind. Mar. 29, 2011) (citing *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000)). The commentary to the Guidelines outlines two ways in which loss can be calculated; "actual loss" and "intended loss." Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.3(A)(i). Intended loss "(I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1(b)(1) n.3(A)(ii).

The commentary to the Guidelines instruct the sentencing court to apply the greater of intended or actual loss in calculating the sentencing range. U.S.S.G. § 2B1.1 n.3(A). However, for restitution purposes the Court may only use the actual loss amount which deducts funds already returned to investors through mechanisms such as bankruptcy proceedings. *United States v. Durham*, 766 F.3d 672, 687 (7th Cir. 2014) (citing *United States v. Allen*, 529 F.3d 390, 396– 97 (7th Cir. 2008)). The Government argues that all of its proposed loss amounts constitute actual loss.

3

The Court is only obligated to make a "reasonable estimate" of the financial loss based upon the available evidence. U.S.S.G. § 2B1.1 n.3(C).[2] However, determining whether or not a loss was reasonably foreseeable requires the Court to perform causation analysis and conclude the defendant was both the but for and proximate cause. *United States v. Domnenko*, 763 F.3d 768, 777 (7th Cir. 2014) (determining whether a loss was reasonably foreseeable requires causation analysis); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (the causation analysis includes but for and proximate causation inquiries). Furthermore, the reasonable estimate must be based on reliable and specific evidence. *Hogge*, 2011 WL 1158442, at *8; *see also United States v. White*, 639 F.3d 331, 339 (7th Cir. 2011) (while the Federal Rules of Evidence do not apply at sentencing hearings, the district court must ensure evidence used is reasonably reliable).

In the PSR, the Government initially proposed a loss amount of approximately $30 million dollars from approximately 470 victims. (DE 127 ¶27, DE 127-1.) This amount is based on a Microsoft Excel spreadsheet created by Five Star employee Chris Arrowsmith which allegedly catalogues investor funds the Five Star entities held at the time of their collapse. (DE 127 ¶ 27, DE 127-1) The Government subsequently determined an error in its calculation method and revised this proposed loss amount to $27,718,103.[3] Both the initially proposed number and the revised number would result in a 22-point increase to Mr. Miller's offense level.

---

[2] The Guidelines commentary also provides a list of factors a court should consider in making its estimate. *Id.* at n.3(C)(i)–(vi). However, none of these factors are applicable to the circumstances of this case.

[3] The loss amount proposed in the PSR was $30,470,552.25 (DE 127 ¶27). This was modified by the Government at the evidentiary hearing to $27,718,103 based on errors in their initial calculation regarding the estimated interest paid to investors (DE 161-1). The Government indicated to the Court at the evidentiary hearing that these proposed figures account for interest paid to investors but do not account for recovery from the bankruptcy proceeding. The Government indicated it would make such adjustments if the Court approved this loss amount theory.

U.S.S.G.§ 2B1.1(b)(1)(L) (losses of more than $25,000,000 but less than $65,000,000 result in a 22-level enhancement).

In the course of post-trial litigation over the loss amount, the Government proposed a second, alternative, loss amount of $2,853,887. (DE 150-1.) This amount reflects the losses of 69 victims who invested in 5 Star Commercial or 5 Star Capital within the time period covered by the superseding indictment, July 2014 to August 2015.[4] (*Id.*) This proposed loss amount would result in a 16-point increase in Mr. Miller's offense level. U.S.S.G. § 2B1.1(b)(1)(I).

Mr. Miller objected to the loss amount proposed in the PSR on two grounds. First, Mr. Miller argues it is a violation of his constitutional rights because the loss amount alleged by the Government was not proven at trial. Second, he argues that this loss amount is predicated on unreliable and inadmissible evidence, namely the Excel spreadsheet prepared by Mr. Chris Arrowsmith. Mr. Miller also objects to the second proposed loss figure, arguing that the Government has not established he is causally responsible for the loss to those 69 victims.[5] Mr. Miller argues that the loss amount should be limited to the six victims identified at trial. This proposed loss amount (more than $550,000) would result in a 14-point increase in Mr. Miller's offense level. U.S.S.G. § 2B1.1.(b)(1)(H).

### (a) *Mr. Miller's constitutional objection to the loss amount is overruled*

The Court will begin with Mr. Miller's constitutional challenge. Mr. Miller argues that the Government's proposed loss amount based upon 470 victims, without any prior notice at trial

---

[4] Five Star Commercial and Five Star Capital are two of the approximately 15 LLCs which were collectively controlled by Mr. Miller and constituted the Five Star business enterprise.

[5] Mr. Miller, through counsel, raised these arguments orally at the evidentiary hearing on loss amount.

or in the Superseding Indictment, constitutes a violation of his due process rights under the Fifth and Fourteenth Amendment.[6] This argument is without merit and will be denied.

Financial loss is not a required element of mail or wire fraud. *United States v. Leahy*, 464 F.3d 773, 786–87 (7th Cir. 2006) (collecting cases). Therefore, the Court can consider loss amounts beyond those submitted to the jury. *See United States v. Sheikh*, 433 F.3d 905, 906–07 (2d Cir. 2006) ("So long as the facts found by the district court do not increase the sentence beyond the statutory maximum authorized by the verdict or trigger a mandatory minimum sentence not authorized by the verdict that simultaneously raises a corresponding maximum, the district court does not violate a defendant's Fifth or Sixth Amendment rights by imposing a sentence based on facts not alleged in the indictment. Thus, in the instant case, the district court did not violate Sheikh's constitutional rights by imposing a sentence based on a loss amount not alleged in the indictment.") The Court's use of either loss amount proposed by the Government would not trigger a mandatory minimum sentence or raise the maximum statutory sentence. Mr. Miller cites no legal authority for his claim that he is entitled to notice of the alleged loss amount at trial. Accordingly, there is no violation of Mr. Miller's Fifth or Sixth Amendment rights.

### (b) *The objection to the proposed $27 million loss amount is sustained*

The Court now turns to the merits of the Government's proposed $27 million loss amount. The Court finds the Government has failed to carry its burden in establishing this loss amount for several reasons.

---

[6] The Court is uncertain why Mr. Miller invokes the Fourteenth Amendment. Mr. Miller is the defendant in a criminal prosecution by the United States Government, and the Fourteenth Amendment only applies to the several states.

To begin, the Government has not adequately established causation between the proposed loss to 470 investors and the fraud perpetrated by Earl Miller. The Government does not argue that Mr. Miller individually defrauded each of the individuals by taking their money under false pretenses. In fact, some of the individuals listed on the spreadsheet invested in Five Star prior to Miller taking control of the company in July 2014, and the parties seem to accept that prior to Mr. Miller's control the company was running as a legitimate business. (*See* DE 148 at 59:19–22) (Testimony of the FBI forensic account indicating Five Star appeared to be making money at the start of its existence).)

Rather, the Government's theory of causation for this amount is that Mr. Miller's fraud mortally wounded the Five Star business enterprises, causing their collapse, and wiping out all investor holdings. However, the Government has not provided any evidence supporting this theory. For example, there was no evidence or opinion proffered that Mr. Miller's fraud made the entire Five Star enterprise financially untenable, as opposed to some other cause. Nor has the Government offered any evidence that it was reasonably foreseeable to Mr. Miller that his fraudulent expenditures, which the Government states is at least $4.5 million dollars,[7] would cause the collapse of a business with a putative investor fund balance, on its last day of operation, of at least $30 million dollars.

The Government is requesting the Court to make the unsupported inference that Mr. Miller's fraudulent expenditures of at least $4.5 million caused the collapse of the Five Star enterprise. This inference, on this evidentiary record, simply asks too much. Defrauding one's

---

[7] At trial the FBI Forensic Account, Heather Teagarden, testified about her examination of Five Star bank records and summarized the records which were admitted into evidence. This testimony, corroborated by the bank records indicates that between July 29, 2014, and January 2016, Mr. Miller inappropriately spent $4,524,137.57 on himself or outside entities not designated as authorized investments in any PPM and the vast majority of that spending was using investor funds. (DE 148 at 29:3–9; Gov't Exh. 37 (summary table of this spending).)

business enterprise for approximately 13% of its holdings over the course of a few years likely had a negative effect on the business operations.[8] But there is no evidence whatsoever to support that that effect was sufficient to bring down the entirety of the Five Star business enterprise and create the loss for the 470 investors. The Government has made no particular effort to show such causation. The Government provided no evidence about how Mr. Miller's fraud affected the operations of the Five Star business or caused its collapse. Nor have they attempted to show how Mr. Miller could reasonably foresee that his misappropriation of $4.5 million would cause that collapse.

The Court will note that it is reasonable to infer that fraud adversely impacts the operations of a business. It also is reasonable to infer that fraudulent conduct can contribute to or outright cause the collapse of a previously successful and legitimate business. But these inferences must be grounded in facts and evidence. To conclude a certain pattern of fraud was the proximate cause of the collapse of an entire business enterprise requires some evidence to that effect. The Government stating *post hoc ergo propter hoc* —"since event Y followed event X, event Y must have been caused by event X"— is not evidence that Mr. Miller's fraud caused the collapse of the Five Star businesses. As such, the Court cannot find that the Government has carried its burden and will reject this proposed loss amount. *Domnenko*, 763 F.3d at 777.

Next, even if the Government had sufficiently established causation between Mr. Miller's fraud and the collapse of Five Star, the Court finds that the Excel spreadsheet prepared by Mr. Arrowsmith is not sufficiently reliable evidence of the loss to be relied upon during sentencing.

---

[8] The Court uses this merely as an illustrative figure, the Government has not alleged Mr. Miller's entire fraud was the $4.5 million figure and the record does not reflect whether the $30 million figure was Five Star's full balance sheet.

As previously noted, the Court's estimate of the loss amount must be based on reliable evidence. *Hogge*, 2011 WL 1158442, at *8.

At the evidentiary hearing, Mr. Arrowsmith testified about the process of creating the Excel spreadsheet. Mr. Arrowsmith thoroughly explained how he prepared the document at the behest of Scott Bocklund and Global Impact, the equations he used, and that he faithfully compiled the data in the spreadsheet from Five Star's internal application for tracking investments ("the Five Star App"). Mr. Arrowsmith also candidly testified he had no idea whether the investor data contained within the Five Star App was accurate. (DE 167 at 26:8–14, 46:14–22.) Specifically, he testified that he did not know who was responsible for uploading and maintaining that data (*Id.* at 59:18–60:12, 71:15–72:22) and that he had never worked with that data set prior to Scott Bocklund's request in the closing days of the enterprise. (*Id.* at 59:7–22.) Further, he testified that he had no access to Five Star bank records or other accounting documents to verify the data he was collecting.[9] (*Id.* at 38:11–39:22, 46:14–22.) The underlying data from the Five Star App was kept on a server in the Five Star offices and was seized by the FBI pursuant to a search warrant, but the data is encrypted and inaccessible to verify the figures in Mr. Arrowsmith's spreadsheet. (*Id.* at 69:3–7; *see also* DE 148 at 62:9–24 (Ms. Teagarden's testimony describing the server being inaccessible.) Consequently, there is no other evidence in the record to corroborate the Excel spreadsheet investor data or otherwise indicate it is reliable and accurate.

The Government notes a series of Seventh Circuit cases which affirmed the use of documents, whose origin was unknown but were supported by indicia of reliability, to establish

---

[9] The Government has made no argument that the Five Star bank records in their possession corroborate the loss amount in the Excel sheet.

loss amount. The Court recognizes this precedent but finds it to be distinguishable and concludes there are not sufficient indicia of reliability for the data underlying the spreadsheet. Specifically, in the case of *United States v. Williams-Ogletree*, 752 F.3d 658, 663–34 (7th Cir. 2014), the district court used the unauthenticated document discovered during a search of the co-defendant's home to corroborate the statements of a pleading co-conspirator and did not exclusively rely on the document to prove loss amount. There is no such corroboration in this case. Similarly, in *United States v. Sliman*, 449 F.3d 797, 802 (7th Cir. 2006), an unauthenticated check register was corroborated by co-conspirators in their plea agreements. Consequently, the Court is not persuaded the precedent cited by the Government applies to the facts of this case.

For the above reasons, the Court will sustain the objection as it relates to the proposed $27 million loss amount.

### (c) *The Court also sustains the objection to the alternative loss amount*

The Court now turns to the Government's alternative actual loss proposal of $2,853,887.59. This number reflects losses to 69 investors who invested with Five Star Commercial or Five Star Capital between July 2014 and August 2015. (DE 150 at 9, DE 150-1.) This proposed figure deducts interest actually paid to these investors and any funds they recovered during the bankruptcy process. (DE 150 at 10, DE 150-1 (also introduced as Evid. Hearing Gov't Exh. 3)).[10]

The Court begins with the issue of causation for this proposed loss amount as well. The Government's theory of causation for the $2.8 million loss amount is that each of the enumerated

---

[10] The Court will identify the evidentiary hearing exhibits with the preface of "Evid. Hearing", e.g. "Evid. Hearing Gov't Exh. 1." Trial exhibits will simply be referred to by the party introducing them and the exhibit number, e.g. "Gov't Exh. 37."

69 investors chose to invest with Mr. Miller based on the use of Private Placement Memorandums (PPMs), which describe the terms and subject of each securities investment. The Government argues that the PPMs contained misleading or outright fraudulent statements about how their money would be used. There was evidence introduced at trial indicating that each client who invested in Five Star utilized a PPM. Specifically, Five Star's lead sales representative Mike Alfrey testified this was the case. (DE 158 at 27:4–18.)  Mr. Miller himself testified that he expected investors to rely on representations made in the PPMs. (DE 105 at 108:20–109:25.)

However, the Government's causational theory is premised on the idea that the PPMs are inherently fraudulent documents which is not supported by the record. The fraud orchestrated in this case comes from Mr. Miller using investor money in ways outside the authorizations of the PPMs and not because the PPMs themselves were inherently false, such as a counterfeit security might be. Further, Five Star had previously run as a legitimate business enterprise and possibly continued to make some legitimate investments even as Mr. Miller was defrauding some investors.[11] The Court recognizes there is precedent allowing for liability of a defendant who recruits investors to a business which is entirely a scheme and is not a viable business. *See United States v. Swanson*, 489 F.3d 509, 514 (7th Cir. 2007) (affirming the liability of a defendant for $1.3 million in losses caused by a business failure when an IRS Agent who had reviewed the business records testified the business was never viable ). However, the Government has not expressly asked the Court to apply this theory to Mr. Miller and, more

---

[11] Ms. Teagarden estimates that between June 2014, to August 2015, the Five Star entities collected some $10 million from some 70 investors. (DE 148 at 30:21–31:1.) However, for the roughly same period of July 2014 to January 2016, Ms. Teagarden identifies that only approximately $4.5 million was lost to fraud. (*Id.* at 29:1–5.) From the record it is unclear then where the remaining $5.5 million went. The Court cannot ignore the possibility Mr. Miller spent at least some of this money on legitimate business activities while pilfering a considerable share. As the Government bears the burden of establishing loss amount, they are obligated to account for such ambiguities if they want Mr. Miller held liable for these amounts.

importantly, the Government has not shown the entire Five Star enterprise was never viable and existed solely as a vehicle for fraud. Due to these confounding variables, the Government must parse out individual causation chains in establishing the actual loss to each investor.

The Government has illustrated its capacity to do so; at trial it showed that the funds obtained from the victims charged in the indictment were misspent by Mr. Miller in violation of the terms agreed upon in the PPM. However, the Government has not done so with any of the other investors. Consequently, the Court cannot conclude that Mr. Miller's fraud was the cause for the loss of all 69 individual investors' money. At the evidentiary hearing Ms. Teagarden explained that she created this loss chart (DE 150-1 a/k/a Evid. Hearing Gov't Exh. 3) and that she was asked to identify the victims that pertained to the indictment period. However, Ms. Teagarden offers no explanation for how she concluded that the people listed in that document are "victims" of the fraud, as opposed to those who lost money because of the collapse of the Five Star entities. Nor does her trial testimony address the subject. As previously discussed, there is some ambiguity as to whether Five Star was continuing to perform legitimate business operations even while Mr. Miller was committing fraud against some clients. This means the Court cannot make the inference that all of these 69 individuals are victims of Mr. Miller's fraud solely because they invested with Five Star during the indictment period. Consequently, the Court is obligated to reject this proposed alternative loss amount.

(d) *The Court finds the actual loss to be approximately $4.5 million*

Having rejected these two proposed loss amounts the Court finds that the Government has provided sufficient evidence to support an intended loss amount beyond that proven at trial but will need further evidence to identify the specific victims of that loss to support a restitution

order. That number is the $4.5 million figure Ms. Teagarden assigned at trial to Mr. Miller's spending of investor money pursuant to Government Exhibit 37.

As discussed, Ms. Teagarden testified about her examination of Five Star bank records and summarized the records which were admitted into evidence. (DE 167 at 74:3–19; Evid. Hearing Gov't Exh. 3; Gov't Exh. 22 and 23 (Five Star bank records admitted at trial)) This testimony, corroborated by the bank records, indicates that between July 29, 2014, and January 2016, Mr. Miller inappropriately – contrary to the terms of the various PPMs – funneled $4,524,137.57 to himself or outside entities and the "vast majority" of that spending was using investor funds. (DE 148 at 29:3–9; Gov't Exh. 37 (summary table of this spending) (included below).)  The defendant made no attempt to undermine or further limit that characterization.

**Payments from 5 Star Bank Accounts - July 29, 2014 thru Jan 2016**

| | | |
|---|---|---|
| Payments made to Earl Miller from 5 Star bank accounts: | $ | 914,893.97 |
| Payments made to Matt Gingerich from 5 Star bank accounts: | $ | 645,815.67 |
| Payments made to Z Ministries from 5 Star bank accounts: | $ | 214,630.00 |
| Payments made to Cozen O'Connor from 5 Star bank accounts: | $ | 287,500.00 |
| Payments made to Global Impact Companies from 5 Star bank accounts: | $ | 752,727.93 |
| Payments made to Toth & Foraker entities from 5 Star bank accounts: | $ | 1,708,570.00 |
| | $ | 4,524,137.57 |

GOVERNMENT'S
EXHIBIT
**37**
US v. Earl Miller

The Court finds this number best represents the intended loss amount caused by Mr.

Miller's fraud for purpose of Sentencing Guidelines calculations. This number is grounded in the

bank records of the Five Star enterprises and reflects investor money which Mr. Miller used for

purposes not permitted by the PPMs. Said another way, none of the PPMs authorized that

customer investments be distributed to any of these entities. Therefore, this amount is a reasonably foreseeable harm as a result of the offense. U.S.S.G. § 2B1.1(b)(1) n.3(A)(i).[12]

The Court would also note that Mr. Miller testified at the evidentiary hearing that several investors made money with Five Star and thus their alleged losses should not be counted against him for sentencing or restitution purposes. Mr. Miller had previously identified the full list of such investors in an annotated version of the Government's proposed 470-member victim pool. (DE 140; Evid. Hearing Dft. Exh. B (investors who allegedly profited are highlighted in yellow)). As further support of this contention, Mr. Miller filed affidavits from three of these individuals corroborating his claim. (DE 142).

Mr. Miller's testimony in this regard was extremely vague and conclusory. Mr. Miller provided no details or any explanation of the factual basis he had for knowing that these individuals made money. (*See* DE 167 at 87:11–24.) Further, besides the three previously filed affidavits, there has been no corroborating evidence introduced to show that these dozens of investors profited.[13] Besides, that the three affiants say they suffered no loss seems of little

---

[12] The Court will note once again that the Government has not established a specific connection between the losses described in Gov't Exh. 37 and the investors listed in DE 150-1. Put another way, the Court cannot conclude the investors listed in DE 150-1 are the same investors who contributed the $4.5 million Mr. Miller pilfered as described in Exh. 37. Neither during trial, nor during the evidentiary hearing did the Government lay foundation that these two numbers reflect the same pool of funds. While the Government may desire for the Court to infer that connection, it cannot do so on the current record. This is because, as previously discussed, while Mr. Miller pilfered some $4.5 million during the relevant time period, Ms. Teagarden testified some $10 million of investor funds entered Five Star. If the facts were different, and say Mr. Miller had only brought in $4.4 million from the 69 investors during the relevant time period, and then pilfered $4.5 million, it would be an easy inference that all of the investor money was misspent. But on the facts of this case, when the Government has only shown Mr. Miller misspent roughly half of the investor money took in during a set time period, there is a genuine question of who in the investor pool was defrauded. Therefore, while the Court can find that $4.5 million constitutes a loss amount, it cannot yet conclude that is the proper restitution amount.

[13] In his evidentiary hearing testimony, Mr. Miller claims to have a set of business records corroborating his claims available on his personal DropBox. He indicated the first time he mentioned them to his counsel was immediately prior to the evidentiary hearing and, despite his indication he was open to producing these documents, he has not submitted them to the Court.

consequence at this point since the Court does not accept the Government's theory of loss as contained in DE 150-1. Moreover, the fact some individuals made money by investing in Five Star goes to the ultimate calculation of actual loss and restitution, not the calculation of intended loss. Mr. Miller has not made any argument that the alleged profit by these individuals affects the fact that he spent some $4.5 million of investor money contrary to the limitations of the PPMs. Nor does his supplemental response (DE 166) expound on these contentions.

Based upon this evidentiary record, the Court finds $4,524,137.57 reflects a "reasonable estimate" of the financial loss Mr. Miller caused with his fraud based upon the available evidence.[14] U.S.S.G. § 2B1.1 n.3(B).

Accordingly, Mr. Miller's objection to the loss amount is sustained in part. The Court finds the actual loss amount caused by Mr. Miller's fraud to be $4,524,137.57. This results in an 18-level enhancement to Mr. Miller's sentencing guideline calculation. U.S.S.G. § 2B1.1(b)(1)(J).

### (3) Number of Victims (Paragraphs 28 and 39)

Mr. Miller next objects to paragraphs 28 and 39 which apply a two-level enhancement, under U.S.S.G. § 2B1.1(b)(2)(A). This two-level enhancement applies if there are ten or more victims of the fraud, or if the fraud resulted in substantial financial hardship to one or more victims. *Id.* The Probation Office applied the enhancement under both theories based on the 470

---

[14] The Court recognizes that Mr. Miller may take issue with this number given Ms. Teagarden testified that the "vast majority" of this sum was investor money. (DE 148 at 29:9). Nonetheless, the Court finds this to be a reasonable estimate of the loss of Mr. Miller's fraud given the vast majority was investor money and the entire sum was spent contrary to the terms of the PPMs. Further, it is over $1,000,000 greater than the lower limit of this enhancement category which makes it likely that even a "vast majority" of the figure would clear that threshold.  U.S.S.G. § 2B1.1 (b)(1)(J) (losses of more than $3,500,000 result in an 18-point enhancement).

victims reflected in the loss calculation spreadsheet offered by the Government and the substantial financial hardship imposed on Mr. Merle Yoder and Mr. James Eigsti.

Mr. Miller objects on two grounds but does not dispute that Mr. Yoder and Mr. Eigsti suffered substantial financial hardship which would make him eligible for the enhancement. The relevant Application Note to the Sentencing Guidelines instructs that:

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim--
>
> **(i)** becoming insolvent;
>
> **(ii)** filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
>
> **(iii)** suffering substantial loss of a retirement, education, or other savings or investment fund;
>
> **(iv)** making substantial changes to his or her employment, such as postponing his or her retirement plans;
>
> **(v)** making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
>
> **(vi)** suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1 n.4(F).

The PSR and Mr. Yoder's testimony indicate that he was forced to substantially change his living arrangements by moving in with his parents and living with his family for several years in order to recover from his loss after investing his life savings with Mr. Miller. (*See* DE 111 at 11:22–12:2.) The Application Note to the Sentencing Guidelines expressly recognizes that relocating to a less expensive home is a substantial change to living arrangements. U.S.S.G. §

2B1.1 n.4(F)(v); *see also United States v. Poulson*, 871 F.3d 261, 272–73 (3d Cir. 2017) (being forced to leave a home qualifies as a substantial change to living arrangements).

Similarly, the PSR indicates that Mr. Eigsti suffered a loss to his retirement income as a result of Mr. Miller's scheme. Mr. Eigsti testified he lost $50,000 as a result of Mr. Miller's scheme. (DE 108 at 4:21–23.) Mr. Eigsti had retired after spending 30 years working in the prison ministry, with some experience in construction. (*Id.* at 5:16–23.) The Seventh Circuit has held that "substantial loss" under this Guideline provision is a term measured relative to the victim at issue. *United States v. Minhas*, 850 F.3d 873, 877–78 (7th Cir. 2017). The Circuit has affirmed district court findings that dollar losses in the mid-four figures would represent a substantial loss to a person of modest economic circumstances. *Id.* at 876 (finding losses in the range of $2,000 to $10,000 dollars were substantial for the victims, "working people" of "modest means" who had saved for years to accumulate this wealth and would require years to recover the wealth). Mr. Eigsti's financial loss to his retirement income was several times greater than the loss at issue in *Minhas*, which suggests the enhancement is appropriate. Further, the Court finds that a retired prison minister is an individual of modest economic circumstances. Consequently, Mr. Eigsti's loss of retirement income qualifies as a "substantial financial hardship" under the Guidelines. As both of these types of hardships are expressly contemplated by the Application Note, the Court finds that they qualify as substantial financial hardships which merit the enhancement.

Accordingly, the objection is overruled on the grounds Mr. Miller caused substantial financial hardships to two of his victims, and the Court adopts paragraphs 28 and 29.[15]

---

[15] Consequently, the Court does not reach Mr. Miller's objection about the number of victims as the enhancement can apply with substantial financial hardship to a single victim. U.S.S.G. § 2B1.1(b)(2)(A).

### (4) Sophisticated Means (Paragraphs 29 and 40)

The Court will next address Mr. Miller's objections to paragraphs 29 and 40 of the PSR. These paragraphs apply a two-level enhancement based on Mr. Miller utilizing sophisticated means during the course of his fraud. U.S.S.G. § 2B1.1(b)(10)(C). The commentary to the Sentencing Guidelines describes sophisticated means as:

> "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

U.S.S.G. § 2B1.1 n. 9.

The Seventh Circuit has indicated that this enhancement is properly applied "when the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011) (internal quotations and citations omitted). The Seventh Circuit has also stated that the enhancement is proper when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." *United States v. Knox*, 624 F.3d 865, 870–71 (7th Cir. 2010) (quoting *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)). More specifically, the Circuit has held that using multiple corporate names and transferring money between numerous corporate accounts to hide the source of income is conduct which merits the enhancement. *United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998). In a prior case, this Court specifically noted that the transferring of

money between multiple accounts to obfuscate the origin and course of that money is an indicator that supports applying the sophisticated means enhancement. *United States v. Marshall*, No. 3:18-cr-138, 2022 WL 203222, at *3 (N.D. Ind. Jan. 24, 2022).

Mr. Miller argues this enhancement is inappropriate because his crime relied on "simple" transactions of presenting a potential client with a private placement memorandum ("PPM") and them deciding whether or not to invest. Further, Mr. Miller argues that he did not create false accounts or false business records, and that he did not try to hide or conceal assets, all of which weigh against applying the enhancement.[16]

The Court finds that this enhancement is appropriate as the evidence in the record establishes Mr. Miller was utilizing the complex structure of the Five Star enterprises, as fifteen separate legal entities with at least one bank account each, to obfuscate his financial transactions and conceal his fraud.

At trial the FBI's forensic accountant, Ms. Heather Teagarden, testified that Mr. Miller was moving investor money between the bank accounts for different Five Star entities. (DE 148 at 7:11–11:15). Ms. Teagarden further testified that Mr. Miller used at least some of the investor money he obtained to pay off interest owed to other investors. (*Id.* at 30:21–31:14; Gov't Exh. 26 at 5.) Specifically, Ms. Teagarden testified that some of the money obtained from victims Ned Welder and Merle Yoder was used to pay interest checks to other investors. (DE 148 at 31:11–14.) The Court finds this to be a particularly significant indicia of complex means as it resembles the behavior employed by Ponzi schemes, whereby funds from newly enrolled investors are used

---

[16] Mr. Miller's argument seems to be that because he does not meet the listed examples of sophisticated means in the Application Note, he does not qualify. The Court will note, however, that the list is nonexclusive. *Marshall*, 2022 WL 203222 at *4 (citing *United States v. Feaster*, 798 F.3d 1374, 1380 (11th Cir. 2015)).

to sustain payments to existing investors and maintain the appearance of a functioning business.[17] This Court has previously found Ponzi schemes are inherently a sophisticated means of committing fraud. *Marshall*, 2022 WL 203222, at *3 (citing *United States v. Beckman*, 787 F.3d 466, 496 (8th Cir. 2015)); *see also United States v. Spitzer*, 812 F.3d 613, 613–14 (7th Cir. 2016) (affirming the district court's determination that a Ponzi scheme type fraud was a sophisticated means).

The testimony of two other trial witnesses corroborate this pattern of behavior by Mr. Miller. Five Star's bookkeeper, Gil Michel, testified that Mr. Miller was commingling funds, transferring funds from one Five Star entity to another, and it was the equivalent of "robbing Peter to pay Paul." (DE 153 at 22:23–23:10.) Mr. Michel's successor as bookkeeper, Carla Hochstetler, likewise testified that she was asked by Mr. Miller to transfer funds between the different Five Star entities. (DE 152 at 6:15–7:2.) Ms. Hochstetler further testified that Mr. Miller told her that the purpose of these transfers between entities was for the purpose of paying investor checks. (*Id.* at 8:16–18.)

Ms. Teagarden's testimony also suggests that Mr. Miller used transfers between different Five Star accounts to obscure the fact he was spending investor money on his private interests, such as giving to Z Ministries. Specifically, Ms. Teagarden testified that the $50,000 investment Mr. Miller solicited from James Eigsti was deposited with the bank account for Five Star

---

[17] "In a Ponzi scheme, an enterprise makes payments to investors with monies received from newly attracted investors, rather than from profits of a legitimate business venture. Generally, investors are promised large returns on their investments, and initial investors are in fact paid sizeable returns. The fact of those payments helps to attract new investors, giving the impression that a legitimate business opportunity exists, even though there is no underlying business venture. All the while, promoters draw off money from the scheme, often to finance lavish lifestyles. Ultimately the scheme collapses, as more and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid. A Ponzi scheme cannot last forever because the investor pool is a limited resource that will eventually run dry." *Marshall*, 2022 WL 203222, at *3 n.1 (quoting *In re Lake States Commodities, Inc.*, 253 B.R. 866, 869 (Bankr. N.D. Ill. 2000)).

Investment Group I, LLC, then several days later transferred to another entity, Five Star Investment Group VII, LLC, before then being transferred out on the same date as part of a $125,000 transfer to Z Ministries. (DE 148 at 8:3–9:14.) Similarly, a $100,000 investment by Wade Wegner was deposited in one Five Star entity's account, then transferred to a second entity's account, and ultimately transferred externally to Global Impact within a month of the funds entering Mr. Miller's control. (*Id.* at 9:19–11:12.)

Reviewing this offense conduct as a whole strongly supports finding that Mr. Miller was transferring money among his various Five Star entities to conceal the outflow of investor money for his personal expenditures and to maintain the illusion of a functioning, legitimate business by occasionally transferring money from new investors to pay older investors. These are the same maneuvers by which a Ponzi scheme operates. This evidence shows that Mr. Miller's fraud was not a "simple" transaction as he argues. Rather, it relied upon a series of multiple transfers to conceal his theft of investor money.

Accordingly, the Court will overrule the objection to the sophisticated means enhancement and adopt paragraphs 29 and 40.

### (5) Investment Adviser (Paragraphs 30 and 41)

Mr. Miller also objects to paragraphs 30 and 41 of the PSR which apply a four-level enhancement based on Mr. Miller acting as an investment advisor during the course of the fraud. U.S.S.G. § 2B1.1(b)(20)(A)(iii). He argues that he does not satisfy the definition of an investment adviser because he "was not a licensed securities broker or agent," he did not graduate from college, he was not a lawyer or accountant and his general lack of education and business acumen "dispel any notion" that he met the definition. (DE 121 at 4.) This argument is

without merit as none of those qualifications are required in order to meet the definition of an investment adviser. The Sentencing Guidelines utilize a statutory definition of investment advisor. *See* U.S.S.G. § 2B1.1 n.16(A). The relevant part of the definition states:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include …."

15 U.S.C. § 80b-2(a)(11).[18]

As the Government correctly notes this definition is based upon function, i.e. the type of work the individual was performing. It is not tied to Mr. Miller being a licensed securities broker or agent, or having any specific level of education. His "lack of education and business acumen" does not "dispel any notion" he satisfies the definition of this term. (DE 121 at 4.) On the contrary, the facts presented at trial squarely place him within the scope of the definition. Mr. Miller, for compensation, directly advised his clients on the advisability of purchasing the securities being issued by the Five Star entities.

Additionally, other circuits have applied this enchantment to defendants even if they were not licensed advisors. See *United States v. Elia*, 579 F. App'x. 752, 755 (11th Cir. 2014) (unpublished) ("the definition of investment adviser does not depend on the defendant's formal education or licensing. Instead, the definition focuses on the defendant's business practice and

---

[18] The remainder of the definition lists a host of exceptions to this definition, none of which are applicable to Mr. Miller. For example, exception (A) is "banks, or any bank holding company," and "(B) any lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession." 15 U.S.C. § 80b-2(a)(11). As Mr. Miller does not allege that he qualifies for any of these listed exceptions, the Court will not perform an itemized analysis. The Court will note it has considered each exception and found that none apply to Mr. Miller.

how he holds himself out to investors.") (Citing *United States v. Elliott*, 62 F.3d 1304, 1310

(11th Cir. 1995)); *United States v. Onsa*, 523 F. App'x. 63, 64–65 (2d Cir. 2013) (summary

order); *see also United States v. Moskop*, 499 F. App'x. 592 (7th Cir. 2013) (unpublished)

(applying the investment adviser enhancement to an unlicensed securities dealer who presented

himself as authorized to sell securities). Accordingly, the Court overrules this objection and

adopts Paragraphs 30 and 41.

### (6) Vulnerable Victim (Paragraphs 31 and 42)

The Court now turns to Mr. Miller's objection to paragraphs 31 and 42 of the PSR, which

apply a two-level enhancement for knowing a victim of his offense was a vulnerable victim.

U.S.S.G. § 3A1.1(b)(1). The Probation Office applied this enhancement based on the fact most

of Mr. Miller's victims were Amish, with an eighth-grade education, and were unsophisticated in

investment affairs. The application note to the Sentencing Guidelines defines a vulnerable victim

as:

> [f]or purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim
>
> of the offense of conviction and any conduct for which the defendant is accountable ...
>
> and (B) who is unusually vulnerable due to age, physical or mental condition, or who is
>
> otherwise particularly susceptible to the criminal conduct.
>
> U.S.S.G. § 3A1.1 n.2.

Mr. Miller does not dispute the fact his victims should be considered vulnerable, and in

effect does not actually dispute the application of this enhancement. Rather, he argues that

because he shares traits with his victims, being raised in an Amish household and only having an

eighth-grade education, he should also be considered unsophisticated. This argument is simply

non-responsive to the issue of whether the enhancement is appropriate, and the Court will disregard it.

The Court has independently reviewed the criteria for the enhancement and finds it applies. To begin, several of the victims of the fraud were members or raised in the Amish community and only possessed an eighth-grade education. Further, several of Mr. Miller's victims indicated they had limited or no experience with investing in securities. For example, Merle Yoder, who was raised in the Amish community, testified that his only experience in investing was from purchasing a house with his wife and possessing a Roth IRA. (DE 111 at 7:6–9.) Ned Welder testified that while he had experience as a farmer making investments, only a "little bit" of that involved investing in stocks. (DE 109 at 5:13–16.)

Seventh Circuit precedent clearly holds that individuals who have limited experience or are less sophisticated in financial matters can qualify as vulnerable victims. *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003) (finding victims who were elderly and "less sophisticated in financial matters" triggered the enhancement); *United States v. Rumsavich*, 313 F.3d 407, 411 (7th Cir. 2002) (affirming application of enhancement when victims had "demonstrated lack of understanding about financial matters."). In particular, if the victim's lack of knowledge means they "lack the necessary financial sophistication to detect and question [a] fraudulent scheme," then the enhancement is appropriate. *See United States v. Parolin*, 239 F.3d 922, 927 (7th Cir. 2001) ("[the victim, who had no business experience, had never worked outside the home, and had relied upon her deceased husband for financial guidance] therefore was an unusually vulnerable victim"). Other circuits have reached the same conclusion and upheld the application of the enhancement when the victims were inexperienced investors. *See, e.g.*, *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) ("the combination of these

victims' characteristics — and especially the fact that they were inexperienced investors — made them "particularly susceptible" to Fareri's fraud."); *United States v. Anderson*, 440 F.3d 1013, 1018 (8th Cir. 2006) (we find the testimony regarding the [victim's] age, education, work experience, lack of investment experience, and particular susceptibility to persuasion by a church leader sufficient to support the district court's finding of unusual vulnerability.")

Based upon their limited formal education, or limited knowledge regarding financial instruments such as securities, the Court finds that the victims targeted by Mr. Miller, such as Merle Yoder and Ned Welder, lacked the financial sophistication necessary to detect and question Mr. Miller's fraudulent scheme which makes the vulnerable victim enhancement appropriate.

The Court independently finds the enhancement should apply because at least one of Mr. Miller's victims, James Eigsti, was an elderly individual who invested a portion of his retirement savings into the Five Star scheme. *United States v. Iriri*, 825 F.3d 351, 352 (7th Cir. 2016) ("Elderly victims satisfy the requirements of § 3A1.1(b)(1), especially when their financial investments and financial security are at issue.") (quoting *Sims*, 329 F.3d at 944). Mr. Eigsti invested with Five Star when he was in his early 70s.[19] (*See* DE 108 at 4:18–4:22.) This is old enough to merit applying the enhancement based on age. *Iriri*, 825 F.3d at 352 (victim pool ranged from 47 to 71 years old); *Sims*, 329 F.3d at 944 (79% of victims were over the age of 70). The Government only needs to establish a single victim was vulnerable in order for the enhancement to apply. *Parolin*, 239 F.3d at 926. Consequently, in the alternative the Court would apply the enhancement on the basis that Mr. Eigsti is an elderly individual.

---

[19] On the date of his testimony, May 9, 2022, Mr. Eigsti was 78 years old, and he invested with Five Star in June of 2015.

Accordingly, the Court overrules the objection and adopts Paragraphs 31 and 42.

### (7) Restitution Amount (Paragraph 102)

Mr. Miller objects to paragraph 102 of the PSR which states the amount of restitution owed to the victims of his offenses. This dispute is somewhat ancillary to the objection regarding loss amount. Mr. Miller has not objected to the fact he is required by statute to provide restitution. 18 U.S.C. § 3663A. This statute requires the defendant to make restitution to the victim of the offense and defines victim as "any person directly harmed by defendant's criminal conduct in the course of the scheme." *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014) (citing 18 U.S.C. § 3663A(a)(1)–(2)). The Court determines who is a victim under the preponderance of the evidence standard during sentencing. *Id.*

As previously noted, the Court finds the intended loss of Mr. Miller's fraud to be $4,524,137.57.  However, because the Court has no ability at this time to identify which investors lost that money as the result of fraud or whether they were otherwise reimbursed to some extent the Court will defer finalizing the restitution award and afford the Government the opportunity to supplement the record. Pursuant to statute, the Court will set a date for final determination of the victims' losses, no later than 90 days after Mr. Miller's sentencing.[20] 18 U.S.C. § 3664(d)(5); *see also United States v. Robl*, 8 F.4th 515, 524–25 (7th Cir. 2021) (describing district court authority to defer finalizing a restitution amount).

---

[20] The Court will note it approves of the methodology reflected in the Government's chart for the second proposed loss amount (DE 150-1 a/k/a Evid. Hearing Gov't Exh. 3) to determine the restitution amount. As this chart is based on the Five Star financial records and accounts for interest actually paid to the victims and their recovery from the bankruptcy process, the Court finds this highly probative of restitution owed each victim. (DE 150-1). That being said, the Government is still obligated to establish causation for each victim as discussed elsewhere in this order. More particularly, the Government will need to demonstrate that the designated victims lost money as a result of the payments reflected in Gov't Exh. 37 from trial.

**(8)** *Remaining derivative objections*

Mr. Miller also objects to paragraphs 26 (offense level calculation) and 90 (sentencing options) of the PSR based upon his previous objections. He raises no additional arguments. Accordingly, these objections are resolved in accordance with the Court's ruling on the principal objections.

**(B) Conclusion**

For these reasons the Court–

- OVERRULES the objection to the offense conduct (PSR ¶¶ 6 – 23),

- SUSTAINS IN PART the objection to the loss amount (PSR ¶ 27) ,

- OVERRULES the objection to the two-level enhancement for substantial financial hardship under U.S.S.G. §2B1.1(b)(2)(A) (PSR ¶¶ 28 and 39),

- OVERRULES the objection to the two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) (PSR ¶¶ 29 and 40),

- OVERRULES the objection to the four-level enhancement for acting as an investment advisor under U.S.S.G. § 2B1.1(b)(20)(A)(iii) (PSR ¶¶ 30 and 41),

- OVERRULES the objection to the two-level enhancement for vulnerable victim under U.S.S.G. § 3A1.1(b)(1) (PSR ¶¶ 31 and 42),

- SUSTAINS IN PART the objection to the proposed restitution amount (PSR ¶ 102), and

- OVERRULES the objection to paragraphs 26 and 90 of the PSR.

Based upon the Court's rulings, the offense level is 35.

SO ORDERED.

ENTERED: July 18, 2023

_____/s/ JON E. DEGUILIO_____

Judge
United States District Court